Gerald **KALLICK**, on behalf of himself and all other similarly situated stockholders, Plaintiff,

v.

**SANDRIDGE ENERGY, INC.**, a Delaware Corporation, Tom L. Ward, Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., and Jeffrey S. Serota, Defendants.

No. CIV.A. 8182–CS.

Court of Chancery of Delaware.

Submitted: March 7, 2013.
Decided: March 8, 2013.

Stuart M. Grant, Esquire, Michael J. Barry, Esquire, Bernard C. Devieux, Esquire, Grant & Eisenhofer P.A., Wilmington, Delaware; Mark Lebovitch, Esquire, Jeremy Friedman, Esquire, Bernstein Litowitz Berger & Grossman LLP, New York, New York, Attorneys for Plaintiff Gerald Kallick.

Donald J. Wolfe, Jr., Esquire, T. Brad Davey, Esquire, Justin Morse, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; C. William Philips, Esquire, Mark P. Gimbel, Esquire, Covington & Burling LLP, New York, New York, Attorneys for Defendants SandRidge Energy, Inc., Tom L. Ward, Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., and Jeffrey S. Serota.

## OPINION

STRINE, Chancellor.

The incumbent management and board of SandRidge Energy, an oil and natural gas business focusing on domestic exploration and production, face a serious proxy fight. A hedge fund, TPG–Axon ("TPG"), which holds a 7% stake in SandRidge, has launched a consent solicitation to destagger SandRidge's seven-member board by amending the company's bylaws,[1] remove all the directors, and install its own slate.[2] TPG claims that SandRidge's performance has been abysmal during the past six years, resulting in a performance that is extremely poor in comparison to other U.S. oil and gas companies.[3] TPG also alleges that, during the same period, SandRidge's incumbent board has lavished compensation on the corporation's CEO, Tom Ward, paying him $150 million despite the company's subpar performance.[4]

By its consent solicitation, TPG wishes to seat a new SandRidge board majority that has committed to change the management of the company and explore strategic alternatives for the company, including an asset sale.[5] The incumbent board, whose members, along with SandRidge, are the defendants in this action, has resisted the consent solicitation and has energetically campaigned to convince SandRidge's stockholders not to give consents to TPG. Even further, it has tried to obtain revocations from stockholders who have given TPG consents.[6] The incumbent board contends that TPG's slate is less qualified to run SandRidge than it is because TPG's nominees lack expertise in "upstream" oil and gas exploration and have no specific experience with the company's principal asset, a 2.2 million acre oil and gas play in Kansas and Oklahoma (the "Mississippian Play").[7]

For present purposes, what is most relevant is that in originally opposing the consent solicitation, the incumbent board warned the stockholders that the election of TPG's proposed slate would constitute a "Change of Control" for the purposes of SandRidge's credit agreements simply because it involved the election of a new board majority not approved by the incumbent board, and that such a Change of Control would trigger the requirement in SandRidge's note indentures that SandRidge offer to repurchase its existing debt (the "Proxy Put").[8] That is, the in-

---

**1.** The staggered board is implemented by bylaw, not by the certificate of incorporation, leaving it subject to direct stockholder reversal. This defensive planning flaw is rare, but not unprecedented. *See, e.g., Chesapeake Corp. v. Shore*, 771 A.2d 293, 345–46 (Del.Ch. 2000) (finding, in a case addressing a consent solicitation, that stockholders have the right to declassify and replace the board when the classification provision is in the bylaw, not the charter).

**2.** Pl's. Ex. B (Definitive Consent Solicitation Statement of TPG–Axon Partners, L.P. (Jan. 15, 2013)), at 1–2, 15–22 [hereinafter Definitive Consent Solicitation Statement].

**3.** *Id.* at 11.

**4.** *Id.* at 12.

**5.** *Id.* at 13.

**6.** Pl's. Ex. P (SandRidge Energy, Inc., Definitive Consent Revocation Statement (Jan. 18, 2013)) [hereinafter Definitive Consent Revocation Statement].

**7.** *Id.* at 5–6.

**8.** Pl's. Ex. M (SandRidge Energy, Inc., Preliminary Consent Revocation Statement (Dec. 27, 2012)), at 7 [hereinafter Consent Revocation Statement]; Definitive Consent Revocation Statement at 8. The defendants object to the use of the term Proxy Put, claiming that it is "inappropriate" and "has all sorts of assumptions embedded in it." Pl's. Ex. H (Deposition of Daniel Jordan (Feb. 15, 2013)), at 20:25–21:4 (Mark Gimbel) [hereinafter Jordan Dep.]. But, the term is appropriate, because

cumbent board clearly told stockholders that if they chose to elect a new board majority, the Proxy Put would cause a material economic harm because ·SandRidge's lenders would have the right to put $4.3 billion worth of notes back to the company.

After taking that position, the incumbent board faced this litigation from the plaintiff, Gerald Kallick, a SandRidge stockholder who supports the TPG consent solicitation. Kallick argues that the incumbent board is breaching its fiduciary duties by failing to approve the TPG slate, which, under the indentures governing SandRidge's notes, would mean that the SandRidge stockholders could replace the incumbent board without triggering the Proxy Put. Because the incumbent board has been unable to identify any rational question about the integrity of the TPG slate, about their qualifications to serve as public company directors, or about the propriety of their motives, Kallick says there is no proper basis for the incumbent board to fail to approve them. At best, the incumbent board believes it is more qualified than the TPG slate, and believes that TPG's plans for SandRidge are not wise. Such mere differences in policy, says Kallick, are not a proper basis for failing to approve the TPG slate for purposes of the Proxy Put. Kallick therefore argues that the incumbent board should be enjoined from soliciting consent revoca-

tions until it approves the TPG slate, because otherwise it is able to inequitably exploit its incumbency to pressure voters to keep the directors in office simply to avoid the negative consequences of triggering the Proxy Put.

Since TPG first indicated that it would carry out a consent solicitation at the end of November last year, the incumbent board has wiggled and squirmed in order to avoid dealing with this litigation, or the discretion given it to approve the TPG slate for purposes of the Proxy Put. Facing Kallick's suit, the incumbent board assented to a schedule culminating in a preliminary injunction hearing. An order scheduling that argument was entered on February 7, 2013.[9] But, having warned its stockholders twice in its SEC filings that triggering the Proxy Put would be "extreme" and "risky," the incumbent board then reversed direction, and stated in an 8–K the very next day that there was *no* danger posed by the Proxy Put. That was because SandRidge's debt was trading at prices above the repurchase price set in the indentures, and thus debtholders were not likely to tender at a below-market price.[10] The record shows, however, that SandRidge's debt was trading well above par even when the incumbent board declared that triggering the Proxy Put would be "extreme" and "risky." [11]

The incumbent board then sought to cancel the preliminary injunction hearing

---

the Proxy Put gives the noteholders the right to put back their debt after a vote that seats a new board that has not been approved by the ousted incumbents. Like the appellation "poison pill" to describe a plan that gave stockholders "rights," the only value of which was to prevent them from accepting a tender offer because the "rights," if so triggered massively diluted the offeror, the term "Proxy Put" is not intrinsically pejorative. It is descriptive of the intended effect of the device, and the term Proxy Put is actually more closely descriptive. By use of the term, I imply no

judgment about the device's utility. I just use language that tracks the device's operation.

9.  *See* Stip. Sched. Order (Feb. 7, 2013).

10.  Pl's. Ex. R (SandRidge Energy, Inc., Form 8–K (Feb. 8, 2013)) [hereinafter February 8–K].

11.  *See* Pl's. Ex. S (Morgan Stanley discussion materials (Feb. 6, 2013)), at 5 [hereinafter Morgan Stanley Presentation].

to which they just had assented, claiming that there was no material likelihood of harm to the company in not approving the TPG slate.[12] But it failed to decide, one way or the other, whether it approved the TPG slate for purposes of the Proxy Put.[13] That remains true as of today. As a default matter, therefore, the incumbent board has left the TPG slate unapproved. Likewise, although the defendants admit that credit markets can move quickly and although the defendants' estimates of the costs of refinancing the debt keep shifting, the defendants claim that the doubt their own disclosures have created over the consequences of voting for the TPG slate is too insubstantial for the court to worry that the electoral playing field has been unfairly tilted.

■ In keeping with this state's public policy of stringent policing of the fairness of corporate elections, this court's decision in *San Antonio Fire & Police Pension Fund v. Amylin Pharmaceuticals* made clear that a board deciding whether to approve directors for the purposes of a Proxy Put could not act consistently with its fiduciary duties by simply failing to approve any director candidates who ran against the incumbent slate.[14] Rather, the incumbent board must respect its primary duty of loyalty to the corporation and its stockholders and may refuse to grant approval only if it determines that the director candidates running against them posed such a material threat of harm to the corporation that it would constitute a "breach of the directors' duty of loyalty to the corporation and its stockholders" to "pass[ ] control" to them.[15] In other

words, unless the incumbent board determined, by way of example, that the rival candidates lacked ethical integrity, fell within the category of known looters, or made a specific determination that the rival candidates proposed a program that would have demonstrably material adverse effects for the corporation's ability to meet its legal obligations to its creditors, the incumbent board should approve the rival slate and allow the stockholders to choose the corporation's directors without fear of adverse financial consequences, and also eliminate the threat to the corporation of a forced refinancing. Notably, absent any determination by the incumbents that the rival slate has suspect integrity or specific plans that would endanger the corporation's ability to repay its creditors, there is no harm threatened to the creditors by the election of the slate. Rather, the only "harm" threatened is that the stockholders will choose to seat a new board of directors. The incumbents' expected view that they are better suited to run the company effectively is, without substantially more, not a sufficient fiduciary basis to deny approval to their opponents.

Given that the incumbent board has admitted it has no basis to doubt the integrity of the TPG slate or the basic qualifications of that slate to serve with competence as the directors of a public company, the incumbent board is merely basing its refusal to make a decision on its contention that the incumbents are the better choice at the ballot box.[16] Not only has the incumbent board failed to identify any threat the TPG slate poses to the company's creditors or ability to meet its legal obligations, its financial ad-

---

**12.** Defs.' Mot. to Vacate the Scheduling Order (Feb. 11, 2013).

**13.** *See* Definitive Consent Revocation Statement.

**14.** 983 A.2d 304 (Del.Ch.2009).

**15.** *Id.* at 316 n. 37.

**16.** *See* Jordan Dep. 35:3–14, 36:3–37:3, 40:13–22.

visor, Morgan Stanley, has generously offered to pay off the existing debt holders and become the company's lender itself, if the TPG slate is elected.[17] That is, Morgan Stanley told the board that its own financial institution would risk $4.3 billion lent to SandRidge even if TPG's slate controlled the board. The incumbent board's further contention that the SandRidge stockholders will be too stupid not to be confused if the board approves the TPG slate for the sole purpose of alleviating the risk of the Proxy Put [18] is one premised on a view of stockholder cognition inconsistent with giving them a right to vote at all on important matters like elections and mergers.[19] That self-serving, paternalist explanation cannot justify the doubt that the Proxy Put creates in an electoral contest in which each voting decision may turn out to matter immensely.[20]

Having failed to exercise its discretion in a reasonable manner, the incumbent board should be enjoined from soliciting consent revocations, voting any proxies it received from the consent revocations, and imped-ing TPG's consent solicitation in any way until the incumbent board has approved the TPG slate. The equities here weigh heavily in favor of the stockholders' right to make a free, uncoerced choice.

## I. The Background To The Dispute

The factual analysis necessary to address the pending motion is framed by the reality that Kallick does not take much time attacking the SandRidge board's decision to agree to the Change of Control provision containing the Proxy Put in the first place. Kallick's focus instead is on whether the SandRidge board has properly used the contractual discretion left to it by the stockholders to approve the TPG slate for purposes of relieving the corporation of any duty to offer to repurchase SandRidge's debt if that slate is elected.

Kallick's narrow angle of attack is a pragmatic one, given that the note agreements were entered into over several years, starting in 2008, with lenders who provided valuable financing.[21] The record before the court surrounding whether the

---

17. See Morgan Stanley Presentation at 5 ("Morgan Stanley would be willing to provide Change of Control backstop to SandRidge Energy ... Commitment fee of 1.0% ... Take-out fee of 2.0% payable on any bonds issued as a result of the Change of Control put[.]").

18. Jordan Dep. 47:18–48:11 ("Q: [I]f the board could approve TPG–Axon's nominees solely for purposes of the change of control provision while simultaneously putting out public statement to its shareholders that it no way endorses TPG–Axon's nominees and does not support their election would there be any harm to SandRidge or its shareholders ... ? A: I think if you confuse one shareholder sending mixed signals like that, you're doing harm.... Q: So you don't believe there would be any way to eliminate the confusion that would exist in that situation? A: Not totally. Not absolute, no.") (emphasis added).

19. See, e.g., 8 Del. C. § 211(b) (stockholder right to vote to elect directors); id. § 242(b) (stockholder vote to right on charter amend-ment); id. § 251(c) (stockholder vote required for merger); id. § 271 (stockholder vote required for sale of "all or substantially all" of the assets of a company).

20. Mercier v. Inter–Tel (Del.), Inc., 929 A.2d 786, 811 (Del.Ch.2007) ("The notion that directors know better than stockholders about who should be on the board is no justification at all.");

Blasius Indus., Inc. v. Atlas Corp., 564 A.2d 651, 662 (Del.Ch.1988) ("[W]hen viewed from a broad, institutional perspective, it can be seen that matters involving the integrity of the shareholder voting process involve consideration not present in any other context in which directors exercise delegated power.").

21. Defs.' Ex. 1 ¶ 5 (Jordan Aff.); see also Pl.'s Ex. E (SandRidge Energy, Form 10–Q (Nov. 9, 2012)), at 23.

lenders pressed hard for the specific inclusion of a change of control provision dealing not simply with acquisitions of an actual control block or a merger, as opposed merely to the stockholders' election of a slate other than the management slate, is nonexistent. Given the obvious entrenching purposes of a Proxy Put provision, one would hope that any public company would bargain hard to exclude that toll on the stockholder franchise and only accede to the Proxy Put after hard negotiation and only for clear economic advantage.[22] In "frothy" credit financing markets, there is reason (such as SandRidge's financial advisor's own actions in this market) to suspect that the costs of such resistance would be insubstantial to non-existent. Most important, however, because of management's special interest in retaining office, the independent directors of the board should police aspects of agreements like this, to ensure that the company itself is not offering up these terms lightly precisely because of their entrenching utility, or accepting their proposal when there is no real need to do so.[23]

What scarce record exists here is not comforting in this regard. The long-standing independent director who testified on behalf of the defendants, Daniel Jordan, stated that he was ignorant of the existence of the Proxy Put in the indentures until TPG commenced its consent solicitation.[24] Jordan was on the board

when the indentures were adopted and his testimony suggests that the independent board members were not engaged in any memorable way in reviewing any of the indentures, at least insofar as considering the implications of the put provisions that could affect proxy contests or other important events, such as an acquisition offer.[25] Given the importance of this litigation, one would have expected that if the independent directors had been consulted in advance and if there was a record of genuine negotiations to limit the impact of the provision on the viability of a proxy contest, the defendants would have refreshed Jordan's recollection of those fisticuffs with the credit providers. I thus assume that the Proxy Put provisions were accepted by management without resistance and without any input from the board. As it stands, the present motion focuses on the propriety of the defendants' failure to make a decision whether to approve the TPG slate for purposes of the consent solicitation, a failure that means that the electorate must assume that seating a majority of the TPG slate may trigger the Proxy Put.

### A. SandRidge's Stockholders Run Out Of Patience With The Company's Woeful Performance

SandRidge became a public company in

---

22. As Vice Chancellor Lamb put it in *Amylin:* "The court would want, at a minimum, to see evidence that the board believed in good faith that, in accepting [a Proxy Put], it was obtaining in return extraordinarily valuable economic benefits for the corporation that would not otherwise be available to it." *San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 315 (Del.Ch. 2009).

23. *See id.* at 319 (urging boards, and their outside counsel, to be alert to Proxy Put provisions).

24. Jordan Dep. 21:25–22:8 ("Q: [W]ere you aware of [the Proxy Put] at the time the company entered into its first note indenture? A: I don't remember. That was, gosh, five years ago. Q: Do you have any—A: *I don't know if it was in there. I mean, to answer your question, I do not know if it was in there or not.*") (emphasis added).

25. *Id.* at 22:15–23:16.

2007.[26] Its stock was offered at $26 a share, and rose to about $68 in July 2008.[27] It now trades at less than $6.[28] According to TPG, SandRidge has performed worse than any other company in the Russell 1000 Energy Index since its IPO.[29] Frustrated with SandRidge's performance and its weak corporate governance, TPG, one of the company's largest stockholders, wrote a public letter to SandRidge's board in November 2012.[30] TPG complained of a series of strategic missteps, including an erroneous focus on natural gas at the expense of oil; lax spending and financial discipline; and "appalling" corporate governance.[31] In the latter category, TPG noted that SandRidge's chairman and CEO, Tom Ward, has been paid more than $150 million over the last five years, and that he appeared to have engaged in self-dealing on behalf of himself and his family.[32] TPG demanded that SandRidge's bylaws be amended to declassify the board, that the board be reconfigured to include stockholder representatives, that Ward be replaced as CEO, and that the board look into strategic alternatives to maximize the value of its assets, including an asset sale.[33] A few days after TPG sent its letter, another large stockholder, Mount Kellett Capital Management, wrote a public letter to the incumbent board echoing TPG's demands.[34]

### B. The Incumbent Board Adopts Defensive Measures, And Litigation Begins

The incumbent board responded by, among other things, adopting a poison pill, making it harder for the stockholders to take action by written consent, and requiring an affirmative vote of over 50% of stockholders to amend any part of the bylaws concerning the election of directors.[35] TPG then wrote again to the incumbent board, informing them that it was going to seek a consent solicitation under 8 Del. C. § 228 to amend SandRidge's bylaws to destagger the board, and remove and replace the incumbent board.[36] Under § 228, TPG would have had 60 days to collect the required number of consents from the time of receiving its first consent.[37] The incumbent board an-

26. Pl's. Ex. C. (SandRidge Energy, Inc., Form 10–K (Mar. 20, 2012)), at 16.

27. Definitive Consent Solicitation Statement, at 11; V. Am. Compl. ¶¶ 33–34.

28. SandRidge Energy, Inc., *Google Finance*, https://www.google.com/finance?cid=704234 (visited Mar. 7, 2013).

29. Definitive Consent Solicitation Statement, at 6.

30. Pl's. Ex. I (SandRidge Energy, Inc., Schedule 13D (Nov. 13, 2012)), at Ex. 2 (letter to the Board of Directors (Nov. 8, 2012)) [hereinafter TPG November 8 Letter]. At the time of the letter, TPG–Axon had over 4.5% of SandRidge; it increased its stake later to 6.7%. *See id.;* Pl's. Ex. D (SandRidge Energy, Inc., Schedule 14A (Jan. 24, 2013)), at Ex. 3.

31. TPG November 8 Letter, at 5.

32. *Id.* at 5–7.

33. *Id.* at 1–2.

34. *Mount Kellett Sends Letter to the Board of SandRidge Energy*, PR Newswire (Nov. 15, 2012), http://www.prnewswire.com/news–releases/mountkellett-sends-letter-to-the-board-of-sandridge–energy–179486931.html (last visited Mar. 7, 2013). At the time of sending the letter, Mount Kellett owned 4.5% of SandRidge's stock. *Id.*

35. Pl's. Ex. J (SandRidge Energy, Inc., Form 8–K (Nov. 20, 2012)), §§ 1.01, 5.03.

36. V. Compl., *TPG–Axon Partners, LP v. SandRidge Energy, Inc.*, C.A. No. 8147–CS (Del. Ch. Dec. 24, 2012), at Ex. B (letter from TPG to SandRidge (Nov. 30, 2012)).

37. 8 Del. C. § 228(c) (providing that approval to take action by written consent must be obtained "within 60 days of the earliest dated consent delivered in the manner required by this section to the corporation").

nounced that this 60 day period had begun on December 19, 2012, almost a month before TPG filed its definitive consent solicitation statement with the SEC, and before TPG filed its preliminary consent solicitation statement.[38] TPG filed suit on December 24, 2012, alleging that this challenge to the start date was inequitable and an attempt to manipulate the time period set out in § 228.[39]

On December 26, 2012, TPG filed its preliminary consent solicitation statement.[40] The incumbent board responded the following day by filing a preliminary consent revocation statement.[41] The incumbent board warned TPG's stockholders that, under the terms of the indentures governing SandRidge's senior notes, a replacement of the board would be deemed a change of control, and the company would be obliged to offer to repurchase $4.3 billion of debt at 101% of par.[42] The incumbent board warned that *"[t]he Company may not have sufficient liquidity to fund the purchase price for such senior notes as required under the Indentures,"* and that *"[a] mandatory refinancing of this magnitude would present an extreme, risky and unnecessary financial burden"* on the Company.[43]

On January 7, 2013, Kallick, who supports TPG's consent solicitation, initiated this action. In his complaint, Kallick pointed out that the incumbent board could neutralize the effect of the Proxy Put by "approving" the TPG slate of directors, in accordance with the terms of the indentures.[44] The indentures provide, in relevant part, that a Change of Control occurs if,

> during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors of the Company or any Successor Parent (*together with any new directors whose election to such board or whose nomination for election by the stockholders of the Company or any Successor Parent, as the case may be, was approved by a vote of 66 2/3% of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved*), cease for any reason to constitute a majority of such Board of Directors then in office. . . . [45]

Kallick argued that, under this court's decision in *Amylin,* the mere fact that the incumbent board was opposing the slate proposed by a dissident stockholder did not mean that the board could not approve that slate for purposes of the Proxy Put.[46] In fact, Kallick pointed out that in *Amylin,*

**38.** *See* Stip. & Order of Dismissal, *TPG–Axon Partners, LP v. SandRidge Energy, Inc.,* C.A. No. 8147–CS (Del.Ch. Jan. 17, 2013).

**39.** V. Compl., *TPG–Axon Partners, LP v. SandRidge Energy, Inc.,* C.A. No. 8147–CS (Del. Ch. Dec. 24, 2013).

**40.** *Id.* Ex. L (SandRidge Energy, Inc., Preliminary Consent Statement of TPG–Axon Partners, L.P. (Dec. 26, 2012)).

**41.** *See* Consent Revocation Statement.

**42.** *Id.* at 7. The $4.3 billion consists of six series of high-yield notes, with the first series maturing in 2016 and the last series maturing in 2023. *See* Pl's. Ex. E (SandRidge Energy,

Form 10–Q (Nov. 9, 2012)), at 23. The indentures governing the notes are identical in relevant part.

**43.** Consent Revocation Statement, at 7 (emphasis added).

**44.** *E.g.,* V. Compl. ¶ 3.

**45.** Pl's. Ex. F (SandRidge Energy, Inc., Indenture for 7.5% Senior Notes Due 2023), at § 1.01 [hereinafter Indenture] (emphasis added).

**46.** 983 A.2d 304, 314–15 (Del.Ch.2009).

this court noted that in making that determination the "directors' duty of loyalty [is] to the corporation and its stockholders."[47] Because the incumbent board had no proper basis to deny approval to the TPG slate simply because it was proposing to unseat the incumbents, Kallick argued that the incumbent board was breaching its fiduciary duties by failing to approve the slate for the limited purpose of the Proxy Put.

TPG then filed its definitive consent solicitation statement with the SEC on January 15, 2013. The incumbent board then settled its dispute with TPG over the start date of the 60 day consent period, and agreed that it would be deemed to start on January 15.[48] The board filed its definitive consent revocation statement on January 18. The board reiterated that a change in control would be risky:

> The removal and replacement of a majority of the Board as a result of the TPG–Axon Consent Solicitation could constitute a "change of control" under certain of the Company's material agreements, requiring the Company, among other things, to offer to buy back over $4.3 billion of its senior notes, which could be materially harmful to the Company.[49]

But, the incumbent board also admitted that it could avoid triggering the change of control provision by approving TPG's slate:

> The removal and replacement of a majority of the members of your existing Board would constitute a "change of control" under the Company's senior secured revolving credit facility.... If the Company were required to offer to purchase all of such notes as described above, up to $4.3 billion of senior notes could become subject to repayment and refinancing by the Company. The amount ultimately subject to repayment and refinancing would depend upon the amount of outstanding senior notes for which the offer to purchase by the Company is accepted by holders.... *A refinancing of $4.3 billion would present an extreme, risky and unnecessary financial burden on your Company. The TPG–Axon Group's assertion that repayment of the Company's outstanding senior notes, if required, would not materially impact the Company reflects a fundamental misunderstanding of the Company's business, financial position and operations. However, if the Board takes actions to approve the TPG–Axon Group Nominees that are permitted by the Indentures, such refinancing would not be required.*[50]

The incumbent board then stated in the same disclosure that it had not yet decided whether it *would* approve the new slate.[51]

## C. The Incumbent Board Tries To Evade This Lawsuit By Changing The Position It Took In Its SEC Filings

In February, the incumbent board made an about-face. The defendants, after agreeing to a schedule leading to an injunction hearing on March 7, 2013, stated in an 8–K that if the Proxy Put was triggered, SandRidge's lenders would be "unlikely" to redeem their notes, because the notes were currently trading at a price

---

47. *Id.* at 316 n. 37.

48. Stip. & Order of Dismissal, *TPG–Axon Partners, LP v. SandRidge Energy, Inc.,* C.A. No. 8147–CS (Del.Ch. Jan. 17, 2013).

49. Definitive Consent Revocation Statement, at 5.

50. *Id.* at 8 (emphasis added).

51. *Id.* ("The Board has not made a determination with respect to the approval of any of the TPG–Axon Group nominees.").

greater than 101% of par.[52] Furthermore, the company would be able to obtain the "backup financing necessary" to repurchase any notes that were tendered.[53] Thus, the incumbent board no longer believed that electing an unapproved new slate would be "extreme" and "risky," as the incumbent board had described it in both its preliminary and definitive consent revocation statements. Instead, the incumbent board suggested that there might be *no* consequences at all to its failure to approve the insurgent slate.[54] Because of this lack of consequences, the defendants argued that expedited proceedings were unnecessary.

I did not grant the defendants' motion to vacate the scheduling order.[55] The defendants' motion was effectively an attempt to use a procedural mechanism to deny Kallick the relief he seeks in this lawsuit. If the motion had been granted, and the 60–day consent solicitation period had expired before the case was heard, Kallick's action would arguably have become moot. Furthermore, the incumbent board did not identify any reason why it had gone from informing its stockholders that the Proxy Put would represent an extreme risk to informing them that the Proxy Put represented *little* risk. Since September last year, SandRidge's bonds have been trading at well above 101% of par, just as they are now, a fact that the defendants acknowledge.[56] Thus, there is no reason, based on changing market conditions, why

the board should have changed the information it gave to SandRidge's stockholders.

## II. *Kallick's Motion For Injunctive Relief*

The incumbent board has refused to decide whether to approve TPG's slate for purposes of the Proxy Put, claiming that it would be confusing to the company's stockholders and detrimental to its position in the credit markets.[57] As a result of the incumbent board's non-decision, the electorate must consider the potential risks in electing a new slate of directors, an event that depending on which version of the incumbent board's own shifting view of reality one embraces, would either be of no consequence or be one that has an "extreme" deal of financial risk and cost. In his complaint, Kallick originally sought mandatory relief to require the board to approve the TPG slate.[58] In his brief, Kallick requested a narrower form of declaratory and injunctive relief to neutralize the incumbent board's non-decision. Kallick seeks (i) to enjoin the defendants from soliciting any consent revocations; (ii) to have any consent revocations obtained to date declared invalid; and (iii) to enjoin the defendants from taking any steps to hinder TPG's consent solicitation until they have complied with their fiduciary duties and have approved the TPG slate, or have explained in full why they will not approve it.[59]

---

52. *See* February 8–K.

53. *Id.*

54. Defs.' Mot. to Vacate the Scheduling Order, at 2 (Feb. 11, 2013).

55. *See* Tr. of Rulings of the Ct. (Feb. 15, 2013).

56. *See* Morgan Stanley Presentation, at 4; *see also* Defs.' Ans. Br. 11.

57. Defs.' Ans. Br. 2–3; Jordan Dep. 45:18–23 (explaining that the only harm of approving TPG's slate is that it would be "confusing to the shareholders").

58. V. Am. Compl. 35–36.

59. Pl's. Op. Br. 27.

■ The standard for a preliminary injunction in this court is well-known. To prevail on a motion for preliminary injunction, a plaintiff must prove that: (1) he is likely to succeed on the merits of his claims; (2) he will suffer imminent, irreparable harm if an injunction is not granted; and (3) the balance of equities weighs in favor of issuing the injunction.[60] Because the three prongs of this test are interconnected, I do not engage in a lengthy individual discussion of each one. Instead, I will discuss the facts in the record and the applicable law, and explain why the defendants are likely violating their fiduciary duty of loyalty to SandRidge and its stockholders. I then summarize, at the end, why Kallick prevails on all three prongs of the preliminary injunction test, and why I grant Kallick even more narrowly tailored injunctive relief than he seeks, but no mandatory or declaratory relief.

### A. The Incumbent Board's Unconvincing Justification For Its Refusal To Approve TPG's Slate

In defense of its non-decision as to whether to approve the TPG slate, the incumbent board makes a variety of cursory arguments. I now analyze them and make findings of fact as to them consistent with the appropriate procedural standard, which requires me to determine, from the record before me, what would likely be the state of reality found to exist after trial.[61] For reasons that may reflect the expedited nature of the case, but may also reflect the fact that the SandRidge board has engaged in inadequate deliberations concerning the Proxy Put, the record is decidedly spare. There are only two depositions in the record: one is of Daniel Jordan, a SandRidge director who is independent under New York Stock Exchange rules, and one is of Michael Johnson, a managing director at Morgan Stanley who is a financial advisor to SandRidge.

First, the defendants claim that the TPG slate does not consist of directors with sufficient energy industry experience.[62] The only available information about the nominees in the record, and the information the defendants also heavily rely on in reaching their conclusions about the nominees' qualifications, is the information available from the Definitive Consent Solicitation Statement, which is excerpted in brief:[63]

| Name | Experience |
| --- | --- |
| Stephen Beasley | Mr. Beasley founded Eaton Group, an investment firm. He served as President of El Paso Corporation's Eastern Pipeline Group, which operates gas pipeline systems and distributes natural gas throughout the United States, for 4 years. While President of El Paso, he was also the Chairman and President of Tennessee Gas Pipeline Company and ANR Pipeline Company. He has served as a board of a director for several other companies in the energy industry. |
| Edward Moneypenny | Mr. Moneypenny was a senior Vice President and Chief Financial Officer of 7–Eleven, Inc. from 2002 to January 2006. In 2001, he |

60. *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.,* 506 A.2d 173, 179 (Del.1986) (citing *Gimbel v. Signal Cos.,* 316 A.2d 599, 602 (Del.Ch.1974), *aff'd,* 316 A.2d 619 (Del. 1974)).

61. *E.I. du Pont de Nemours & Co. v. Bayer CropScience L.P.,* 958 A.2d 245, 251–52 (Del. Ch.2008).

62. Defs.' Ans. Br. 19.

63. *See* Definitive Consent Solicitation Statement, at 17–21.

| | |
|---|---|
| | was the President of and Chief Financial Officer of Covanta Energy Corporations which owns and operates infrastructure for the conversion of waste to energy. He was also the Chief Financial Officer of two other Fortune 500 energy companies, including Florida Progress Corporation (currently Duke Energy Corporation). |
| Fredric Reynolds | Mr. Reynolds served as Executive Vice President and Chief Financial Officer of CBS Corporation from January 2006 until August 2009. He also served as Chief Financial Officer of Westinghouse Electric Corporation from 1994 to 2000 when it was bought by CBS. Before Westinghouse, he served as Chief Financial Officer of Pepsi Company. He is currently a director of AOL, Inc., Mondelez International (formerly Kraft Foods, Inc.), and MGM Studios. |
| Peter Rothschild | Mr. Rothschild has 30 years of experience in investment and merchant banking. He is currently CEO of Daroth Capital Advisors. He was a managing director at Wasserstein Perella. Earlier in his career, at Drexel Burnham Lambert, he covered the energy industry for six years. |
| Dinakar Singh | Mr. Singh is a Co–Founder and CEO of TPG–Axon Capital. Before TPG, Mr. Singh was a partner at Goldman Sachs, where he worked for 14 years. He serves on the board of Columbia University Medical Center, the New York Public Library, the Rockfeller University, and Cold Spring Harbor Laboratories. |
| Alan Weber | Mr. Weber is currently CEO of Weber Group LLC, an investment management firm. He is also the former Chairman and CEO of U.S. Trust Co. He served as Aetna's Chief Financial Officer and worked at Citibank for 27 years. |
| Dan Westbrook | Mr. Westbrook has been a director of Enbridge Energy Company since 2007 and a member of its Audit, Finance, and Risk Committee. Before that role, he worked at BP China Gas Power, Upstream and at Amoco Corporation where he gained experience developing energy and petroleum businesses. |

Although the defendants admit that "five" of the directors in fact have "some" energy experience, they fault three of the five members for not having "upstream" oil and gas experience and the directors with upstream experience for not having experience with the Mississippian Play.[64] Despite these very particular arguments, the incumbent board has no reason to doubt the integrity of the TPG slate, as Jordan admitted in his deposition:

Q: Did the board find out anything that would lead you to believe TPG–Axon's nominees are people of ill repute?

A: No. I mean, that's—that's—no.

Q: Did the board's internal investigation reveal that TPG–Axon's nominees were anything other than respected and well-accomplished business people?

A: I'm sure they are in their own fields. . . . [65]

Taken as a whole, therefore, the record supports nothing more than the conclusion that the incumbent board, as expected, believes that it is managing the company in an optimal manner, that it has better qualifications than the TPG slate, that the TPG slate's plans for the company are not wise, and that the incumbents should therefore continue to run the company. In other words, the incumbent board has sim-

64. Defs.' Ans. Br. 7–8.

65. Jordan Dep. 40:2–10.

ply made the same determination that all incumbents who seek to continue in office make: we are better than the new guys and gals, so keep us in office. Such self-belief does not come close to a reasoned conclusion that the electoral rivals lack the integrity, character, and basic competence to serve in office. Nothing in this record indicates that any incumbent board member or incumbent board advisor has any reasonable basis to dispute the basic qualifications of the TPG slate.

Second, the defendants used a leading question at a deposition to elicit the concern from Jordan that the company would be sued by noteholders if they approved of the nominees in bad faith:

Q: Now, if the board were to approve the TPG–Axon slate even though it believed that the election of that slate would be harmful to SandRidge, would it be possible that bondholders could sue the company for making that approval decision in bad faith?

A: Yeah. That's possible. Absolutely.[66]

But Jordan, while he was being examined by the opposing counsel, and before an hour-long break in the deposition, had already testified to a *diametrically opposite* conclusion:

Q: Would approving TPG–Axon's director nominees for the limited purpose of the change of control provision violate any duties the company owes to its bondholders?

A: *Violate any duties that we owe to our bondholders? Approving their slate? I don't think it does.*[67]

Relatedly, the incumbent board suggests that if it approves TPG's slate, this approv-

al would compromise the company's ability to obtain financing because, presumably, such lenders would charge a higher price for credit, perceiving SandRidge as a company that "circumvents" change of control provisions.[68] The sum and substance of the record support for this proposition is this testimony by Johnson, the incumbent board's financial advisor:

Q: Would it be more difficult or expensive for a company like SandRidge to obtain financing without such a change of control provision?

A: Yes.

Q: If SandRidge were perceived as having approved the TPG–Axon slate simply in order to neutralize the change of control provisions in its debt instruments, could that have an effect on its ability to obtain financing in the future? [Objection.]

A: It would—it would be highly likely in my opinion that it would have an impact on the price at which they could obtain financing. I'm not prepared to speculate on whether it would impact whether they could obtain financing or not.[69]

But, before he gave that answer, Johnson had testified as follows:

Q: Would a change in control at SandRidge affect market conditions for their bonds?

A: No.

Q: And why is that?

A: The market conditions for the bonds are driven by factors that are separate from whether SandRidge has a change in control or not.[70]

66. *Id.* at 79:22–80:3.

67. *Id.* at 75:18–24.

68. Defs.' Ans. Br. 2–3.

69. *Id.* Ex. 3, at 59:14–60:9 (Deposition of Michael Johnson (Feb. 22, 2013)) [hereinafter Johnson Dep.].

70. *Id.* at 30:6–14.

At the same time as the incumbent board is arguing that creditors will exact a penalty for SandRidge's approval of a dissident slate, it also now argues to the court that, if the Proxy Put is triggered, there will be no harm even if the company does have to refinance, because the froth has returned to the debt markets, credit is easy to obtain, providers are competing to lend, and there will be insubstantial costs to refinance.[71] These arguments bring to mind one definition of genius, I suppose.[72] But viewed more realistically, these are fundamentally inconsistent propositions put forward to justify the incumbents' refusal to make an approval decision, one way or the other. In that regard, the lengths to which the incumbents' loyal financial advisor would go to aid their litigation aims were great but constrained: he refused to directly answer if it would be "harmful" to SandRidge to elect TPG's nominees.[73]

Notably, the incumbent board and its financial advisors have failed to provide any reliable market evidence that lenders place a tangible value on a Proxy Put trigger—not a change in board composition accompanying a merger or acquisition or another type of event having consequences for the company's capital structure, but a mere change in the board majority. In fact, the evidence in the record indicates that credit providers would be happy to keep lending to the company if the board changed majority. Johnson's own employer, Morgan Stanley has offered to refinance SandRidge's debt for a 1% fee if the board majority turned over.[74] Thus, Johnson's suggestion that the incumbent

**71.** The defendants have not quantified precisely the cost that failing to approve the TPG slate will impose on the company. They now suggest that the most likely cost of the Proxy Put is $17 million, which represents Morgan Stanley's 1% commitment fee of a $1.7 billion refinancing. The defendants assume that SandRidge will only need to refinance $1.7 billion because they subtract from the $4.3 billion principal of the notes outstanding $2.6 billion that the company has in cash through the recent sale of its Permian Basin assets. *See* Ans. Br. 27. This is a new position because the incumbent board earlier asserted that the full $4.3 billion would need to be refinanced, with higher refinancing costs. But, when SandRidge announced the sale of the Permian Basin assets, it stated that it would use the proceeds to "reduce debt, ... fund capital expenditures and for general corporate purposes." Defs.' Ex. 4 (SandRidge press release (Feb. 26, 2013)). This indicates that not all of the $2.6 billion would be put towards paying off SandRidge's debt, and that SandRidge would need to obtain a commitment to refinance more than $1.7 billion. Furthermore, the defendants acknowledge that if noteholders did put back their debt, SandRidge would have to pay a take-out fee of 2% on the debt that SandRidge did reissue. Morgan Stanley Presentation, at 5. But at the same time, the defendants hold out the hope that financing could be obtained more cheaply from another bank. Defs.' Ans. Br. 28. The defendants have thus not provided any firm estimate of the cost that the Proxy Put will impose on the company. And perhaps most notably, the defendants' position that *if the TPG slate wins*, debt financing will be readily available to SandRidge belies any basis for asserting the TPG slate poses a rational threat to the company's ability to repay its debtholders.

**72.** "The test of a first-rate intelligence is the ability to hold two opposed ideas in mind at the same time and still retain the ability to function." F. Scott Fitzgerald, *The Crack–Up* (1936).

**73.** *See* Johnson Dep. 61:24–62:9 ("Q: Would—in your view, could it be harmful for the company to elect a slate that lacked that kind of exploration and production experience? A: I would say that because the company's growth is driven by the development of the Mississippian Play, as the company is currently configured, that *it would be more helpful to have board members who understand the mechanics of that position*.") (emphasis added).

**74.** Morgan Stanley Presentation, at 5.

board's approval of the TPG slate might have an effect on the price at which SandRidge could obtain financing is *inconsistent with his own presentation to the SandRidge board that Morgan Stanley would be happy to provide financing to SandRidge even if the TPG slate was in control.*

Kallick, for his part, stresses that Jordan could not recall any discussion about whether to include the Proxy Put in the company's notes and admitted that the company derives no benefit from them.[75] This testimony implies that the board gave little or no consideration to the adoption of the Proxy Put. But, boards have a duty to their stockholders to pay very close attention to provisions that affect the stockholder franchise, such as Proxy Puts. This court made this duty explicit in *Amylin.*[76]

Taken as a whole, the record, such as it is, reveals the following. The incumbent board has no reasonable basis to conclude that the TPG slate is unqualified to serve with basic competence and integrity as the directors of a public energy company. The incumbent board has identified no specific threat that the TPG slate's plans have on the ability of SandRidge to repay its creditors. To the contrary, its own current argument that the triggering of the Proxy Put is no longer an "extreme" financial risk, but a yawn, because lenders will be glad to cheaply refinance SandRidge's debt if the TPG slate wins, refutes any rational basis for the refusal to approve the TPG slate for purposes of relieving SandRidge of any harm from triggering the Proxy Put. Nonetheless, the board refuses to make a decision whether to approve the TPG slate for purposes of the Proxy Put, a protection that is supposedly for the benefit of the lenders, and thus leaves the corporation exposed to the potential for a mandatory refinancing of its $4.3 billion in long-term debt if the TPG slate is elected.

Regrettably, I am left with the impression that this condition of piquant ambiguity is one that the incumbent board, for tactical electoral reasons, finds of utility in its attempt to remain in power. That impression is reinforced by the shifts in position by the incumbents as this litigation has progressed, positions that seem more convenient than principled. In this context where the importance of the stockholders' right to choose is paramount, games-playing is not something our law takes lightly.[77]

With those basic facts in mind, I turn to resolving the application before me, which is neatly framed by the parties' starkly different views of what standard applies to determining whether the incumbent directors have likely breached their fiduciary duties by failing to approve the TPG slate for purposes of the Proxy Put.

### B. *The Standard Of Review*

For their part, the incumbent board argues that the standard of review is the plain vanilla business judgment rule, which requires that their decision be approved if it can be attributed to any rational business purpose.[78] Thus, the incumbent board argues for something as close to non-review as our law contemplates.[79]

---

**75.** Jordan Dep. Tr. 21:17–23:1, 23:21–24:2.

**76.** *San Antonio Fire & Police Pension Fund v. Amylin Pharms. Inc.,* 983 A.2d 304, 319 (Del. Ch.2009).

**77.** *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439 (Del.1971) ("[I]nequitable ac-

tion does not become permissible simply because it is legally possible.").

**78.** *See Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).

**79.** *See generally* Stephen M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine,* 57 Vand. L.Rev. 83 (2004) (arguing that,

Not unexpectedly, Kallick comes playing the Sousa-inspired sounds of *Blasius,* arguing that the incumbents may only fail to approve the TPG slate if they can prove that there is a "compelling justification" for their decision.[80] Kallick argues that, because the effect of the Proxy Put is to place a toll on the voting decision of the electorate, the primary purpose of such a provision is disenfranchising within the meaning of the *Blasius* standard. As readers familiar with *Blasius* are well-aware, that standard of review is a potent one and its express trigger was stated in correspondingly stark terms. For the *Blasius* standard to be invoked, the challenged action had to be "taken for the sole or primary purpose of thwarting a shareholder vote." [81] If that predicate was laid, then the defendants could only justify their actions by showing a compelling justification, a very high standard drawing on the closest scrutiny used in cases involving racial discrimination and restrictions on political speech.[82]

For reasons I have explained elsewhere, and will not repeat in detail, *Blasius'* importance rests more in its emphatic and enduring critical role in underscoring the serious scrutiny that Delaware law gives to director action that threatens to undermine the integrity of the electoral process, than in its articulation of a useful standard of review to decide actual cases.[83] Precisely because our law embraces a republican model giving directors substantial authority to use their own judgment while in office, it is vital that the stockholders have a genuinely fair opportunity to elect new directors.[84]

But the standard of review *Blasius* offers does little to address situations like this, where a contractual provision cannot be said to have the "sole or primary purpose" of impeding the stockholders' vote, because it might have a legitimate purpose of protecting creditors who in fact insisted on its inclusion for their own good-faith reasons, but does have the obvious potential to tilt the electoral playing field toward the incumbent board.

For reasons I have previously explained, our Supreme Court's invocation of a flexible, intermediate standard of review— *Unocal*—to address situations where boards of directors make decisions that have clear implications for their continued control was explicitly designed to give this court the ability to use its equitable tools to protect stockholders against unreasonable director action that has a defensive or entrenching effect.[85] By enabling the Court of Chancery to examine whether the

under the business judgment rule, courts refrain from reviewing directors' decisions).

80. *Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 661 (Del.Ch.1988).

81. *Id.* at 662.

82. *See, e.g., United States v. Playboy Entm't Group,* 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest."); *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("[G]overnment may treat people differently because of their race only for the most compelling reasons.").

83. *See Chesapeake Corp. v. Shore,* 771 A.2d 293, 317–24 (Del.Ch.2000); *Mercier v. Inter-Tel (Del.), Inc.,* 929 A.2d 786, 805–13 (Del.Ch. 2007). *See generally* Leo E. Strine, Jr., *The Story of Blasius Industries, Inc. v. Atlas Corp.,* in *Corporate Law Stories* 244, 275 (J. Mark Ramseyer, ed., 2009).

84. *Blasius,* 564 A.2d at 659 ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests.").

85. *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954–55 (Del.1985).

directors taking actions have acted in a circumstantially reasonable way, the Supreme Court provided a responsible form of review that smokes out self-interest and pretext, by requiring boards that face the omnipresent specter of *Unocal* to justify their actions as reasonable in relationship to a threat faced by the corporation.[86] This Court has followed the Delaware Supreme Court and applied *Unocal* in these situations with a special sensitivity towards the stockholder franchise.[87]

By definition, a contract that imposes a penalty on the corporation, and therefore on potential acquirers, or in this case, simply stockholders seeking to elect a new board, has clear defensive value. Such contracts are dangerous because, as will be seen here, doubt can arise whether the change of control provision was in fact sought by the third party creditors or willingly inserted by the incumbent management as a latent takeover and proxy contest defense. *Unocal* is the proper standard of review to examine a board's decision to agree to a contract with such provisions and to review a board's exercise

of discretion as to the change of control provisions under such a contract.[88]

Of course, the mere fact that the court uses a heightened reasonableness standard does not mean that the directors will fail to satisfy it. A reasonableness standard is just that. But it does mean that the directors must comply with their *Unocal* duties by identifying a circumstantially proper and non-pretextual basis for their actions, particularly when their actions have the effect of tilting the electoral playing field against an opposition slate. Relatedly, *Unocal* implements, and does not displace, *Schnell*'s generalized insistence that any director action be in fact taken for a proper purpose.[89] By smoking out the directors' reasons, *Unocal* surfaces the issues at stake, including the possibility of bad faith.[90] With these thoughts in mind, I now explain why the defendants' actions cannot pass the *Unocal* test.

### C. The Incumbent Board's Actions Are Likely A Violation Of Its Fiduciary Duty

■ Here, the directors have failed to demonstrate a reasonable justification for

**86.** *E.g., MM Cos., Inc. v. Liquid Audio, Inc.,* 813 A.2d 1118, 1129 (Del.2003) ("Both standards recognize the inherent conflicts of interest that arise when a board of directors acts to prevent shareholders from effectively exercising their right to vote either contrary to the will of the incumbent board members generally or to replace the incumbent board members in a contested election."); *Stroud v. Grace,* 606 A.2d 75, 92, n. 3 (Del.1992) (incorporating *Blasius* standard within *Unocal* review).

**87.** *See Johnston v. Pedersen,* 28 A.3d 1079, 1089–90 (Del.Ch.2011) (applying *Unocal* to preferred stock issuance designed to affect proxy contest); *Mercier,* 929 A.2d at 812–13 (applying *Unocal* to postponement of stockholder vote); *Chesapeake,* 771 A.2d at 330–334 (analyzing supermajority bylaw adopted to affect consent solicitation under *Unocal*).

**88.** *See generally Moran v. Household Int'l, Inc.,* 500 A.2d 1346 (Del.1985) (explaining that defensive measure must be evaluated not only at the time of adoption but also when later used in the face of an actual threat).

**89.** *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439 (Del.1971).

**90.** *See Unocal,* 493 A.2d at 955 (noting that the first prong of the *Unocal* test is "designed to ensure that a defensive measure to thwart or impede a takeover is indeed motivated by a good faith concern for the welfare of the corporation and its stockholders"); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1375 (Del.1995) (noting that a board that takes defensive measures in response to a hostile offer must show, under the first prong of the *Unocal* test, that "it determined in good faith [ ] that the [offer] presented a threat ... that warranted a defensive response").

their refusal to consider whether to approve the TPG slate for purposes of the good faith standard of *Unocal.* In *Amylin,* this court made plain that the board's duty in exercising its discretion under such a contract was focused on the best interests of the corporation and its stockholders, and that its only duty to the creditors was to honor the implied covenant of good faith and fair dealing.[91] The crucial issue for the board's determination is the board's obligation to act in good faith: as Vice Chancellor Lamb held, the board could approve the new slate if "passing control would not constitute a breach of the directors' duty of loyalty to the corporation and its stockholders."[92] Because, as Vice Chancellor Lamb also noted, the failure to approve a new slate might "impinge on the free exercise of the stockholder franchise," and because a board that acts in good faith must seek to protect the stockholders' ability to make an uncoerced choice of directors, it follows that a board may only *fail* to approve a dissident slate if the board determines that passing control to the slate would constitute a breach of the duty of loyalty, in particular, because the proposed slate poses a danger

that the company would not honor its legal duty to repay its creditors.[93]

Thus, this court in *Amylin* focused on the nature of the Proxy Put as a provision giving the creditors protection against a new board that would threaten their legitimate interests in getting paid.[94] Such situations could arise, for example, because the proposed new board consists of "known looters" or persons of suspect integrity. Or, the insurgent slate could have plans for the company posing a genuine and specific threat to the corporation and its ability to honor its obligations to its creditors that prevent the incumbent board from approving them in good conscience for purposes of the Proxy Put.[95] By contrast, where an incumbent board cannot identify that there is a specific and substantial risk to the corporation or its creditors posed by the rival slate, and approval of that slate would therefore not be a breach of the contractual duty of good faith owed to noteholders with the rights to the Proxy Put, the incumbent board must approve the new directors as a matter of its obligations to the company and its stockholders, even if it believes itself to be better qualified and have better plans

---

91. *San Antonio Fire & Police Pension Fund v. Amylin Pharms. Inc.,* 983 A.2d 304, 314–16 (Del.Ch.2009).

92. *Id.* at 316 n. 37.

93. *Id.* at 319.

94. *Id.* at 307 ("[C]onstrued in accordance with generally applied standards, the provision is properly understood to permit the incumbent directors to approve as a continuing director any person, whether nominated by the board or a stockholder, as long as the directors take such action in conformity with the implied covenant of good faith and fair dealing and in accordance with their normal fiduciary duties.").

95. Vice Chancellor Lamb wrote: "The key question is whether approval by the board, under the given circumstances, comports with

the company's implied duty of good faith and fair dealing *which inheres in all contracts, including the Indenture." Amylin,* 983 A.2d. at 315 (emphasis added). Thus, the court recognized that the board should take into account the interests of its creditors in deciding whether to approve the slate. I read this statement as qualifying the court's later statement, in a footnote, that "the directors are under absolutely *no* obligation to consider the interests of the noteholders" in deciding whether to approve the new slate. *Id.* at 316 n. 37. To be more precise, the directors are under no obligation to place any greater emphasis on the interests of the noteholders in making their decision as to the Proxy Put than as to any other decision that implicates the noteholders' contractual rights.

for the corporation than the rival slate. The stockholders, after all, have a fundamental interest in freely choosing for themselves who should constitute the board.[96]

In other words, the duty of loyalty requires the incumbent board to exercise their contractual discretion with the best interests of SandRidge and its stockholders firmly in mind, to the extent that it can do so without breaching the very limited obligations it owes to its noteholders. The parties do not dispute that, under *Amylin*, the incumbent board has the power to approve of TPG's nominees without endorsing the dissident's slate and maintaining its ability to run its own campaign.[97] Thus, it is undisputed that the incumbent board can neutralize any adverse consequences from the Proxy Put if TPG prevails in its proxy contest without signaling its support for the election of TPG's nominees. In this case, the corporation's best interest seems rather obvious, which is in letting its stockholders choose without fear of a compelled refinancing. From a purely financial standpoint, it is clear that SandRidge is not advantaged from being compelled to make an offer to redeem its long-term debt. There is only possible pain, and no possible gain, to SandRidge from triggering the Proxy Put.

Regrettably, as I have discussed, the thin and shifting arguments of the incumbent board do not persuade me that any legitimate interest of SandRidge was served by the board's failure to make an approval decision. Rather, the incumbent

board's behavior is redolent more of the pursuit of an incremental advantage in a close contest, where a small margin may determine the outcome, than of any good faith concern for the company, its creditors, or its stockholders. That self-interested, tactical reason for withholding approval implicates *Amylin*'s basic premise because an "eviscerating" threat to the shareholder franchise exists when the board retains the power to approve the dissident slate, but refuses to exercise that power to protect itself or give itself an advantage in a proxy context.[98] I therefore conclude that the board has likely acted with an absence of good faith and reasonableness inconsistent with their fiduciary duties.

### D. The Incumbent Board Cannot Rely On The Hills Case

The defendants look to this court's decision in *Hills Stores Co. v. Bozic* as comfort for their conduct here.[99] That is an odd place for them to find repose. For starters, in *Hills*, the plaintiff was a hedge fund that had successfully taken control of the company in a proxy fight. The hedge fund's successful campaign for control followed years of pressure efforts that began within a year of the company's emergence from bankruptcy, when the hedge fund proposed having the company leverage up to repurchase $150 million of its shares.[100] During the course of the pressure campaign, severance agreements were entered into by the board with top managers that protected those managers by granting

---

**96.** *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del.Ch.1988). ("The shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests. Generally, shareholders have only two protections against perceived inadequate business performance. They may sell their stock (which, if done in sufficient numbers, may so affect security prices as to create an incentive for altered managerial perform-

ance), or they may vote to replace incumbent board members.").

**97.** *Amylin*, 983 A.2d at 313–14.

**98.** *Id.* at 316.

**99.** 769 A.2d 88 (Del.Ch.2000).

**100.** *Id.* at 91.

them severance if a change of control occurred that was not approved by the incumbent board, including by virtue of a proxy contest.[101] Litigation over these severance agreements and other matters occurred, which involved the hedge fund itself. That litigation was settled with the hedge fund as a party, the severance agreements were left in place, and the hedge fund got an agreement by the company to repurchase $75 million worth of its shares.[102]

Peace was fleeting and the hedge fund came back threatening the very next year, questioning the incumbent board's plans to make capital investments in the business and instead proposing to buy the company itself in a highly leveraged transaction. The hedge fund claimed it could finance up to half of the equity check necessary and had received a "highly confident" promise of debt financing to refinance all of the company's outstanding debt.[103] The incumbent board did not take defensive steps to stop the hedge fund, but refused to approve the change in control for purposes of the severance agreements or the company's credit agreements, which had a similar provision to the Proxy Put in this case.[104] After the hedge fund had installed its own slate as directors, it had the new board sue the outgoing directors for breach of fiduciary duty, alleging that the directors' failure to approve the change of control had cost the company $20 million. This court granted summary judgment to the defendant ex-directors under the *Unocal* standard.

The distinctions between *Hills* and this case are several. To begin with, the primary focus of the litigation was on severance agreements. These involve considerations that are distinct from credit agreements. As I have observed, a lender wants to get paid. An employee wants to get paid too, but has concerns about the identity of her boss that are far more extensive, and legitimately so. A lender, such as the noteholders in this case, can protect itself by financial covenants, such as coverage and leverage ratios.[105] The reality is that the debt, in this context, issued by the company is impersonal. Once the debt is underwritten, it trades like a security. An employee cannot protect herself against a fundamental shift in managerial approach, and has an obvious interest in knowing who her boss is. The record in *Hills* made clear that the board viewed itself as having made a specific, enforceable promise to pay severance to the executives if the incumbent board did not approve a change of control of the board itself.[106] Indeed, the severance agreements were forged specifically because of the managers' fear that the hedge fund itself would take control.[107] Thus, the contractual context and record involve, in my view, distinctive considerations that the defendants here slight.

Lumping together all contracts that have change of control provisions may have some simplistic analytical appeal. The costs, however, of ignoring that different types of contracts address different concerns strike me as large, and the contractual obligation that the corporation owes to its contractual partner in exercising discretion to approve a change in control is of course influenced by the contractual expectations of that partner. And even as to credit agreements, not all

---

101. *Id.* at 91–92.

102. *Id.* at 93–94.

103. *Id.* at 95.

104. *Id.* at 100–01.

105. Indenture artt. 4–5.

106. *Hills,* 769 A.2d at 100–01.

107. *Id.* at 91–92.

changes of control are the same. Critical for lenders are changes in control that directly affect capital structures in a way that could impair the lenders' ability to get repaid, such as mergers or leveraged equity acquisitions. These concerns were paramount in *Hills*, where the board feared, rightly, that an acquirer would leverage up the company.[108] By contrast, in this case, TPG has said that it does not want to leverage SandRidge, but wishes to explore the possibility of selling off assets, in part to reduce SandRidge's cost of capital.[109] And the incumbent board's own financial advisor has offered to finance the company if the insurgent slate prevails, negating any suggestion that the insurgent slate poses a substantial threat to creditors.

As important, the board in *Hills* identified specific threats to the fundamental ability of the company to honor its legal obligations that were posed by the hedge fund and its specific plans for the company. Unlike SandRidge, which the defendants admit is not facing a solvency problem, Hills Stores was in a weak financial state. The company had only recently emerged from bankruptcy and was in the tumultuous retail industry. Furthermore, the hedge fund was proposing to have the company take on enormous leverage having already pressured it to leverage up to repurchase shares the year before, while boasting that it was able to write a full

50% of the equity check, on a deal in which equity was to comprise less than a quarter of the acquisition price.[110] Thus, in contrast to the record here, the board in *Hills* identified specific concerns that turning over control to the hedge fund would be a breach of duty of loyalty because the hedge fund's plans would "be seriously adverse to the interests of the company and its stockholders." [111]

After touting its ability to refinance the company's debt and finance an LBO, the hedge fund in fact won control. It promptly made good on the board's concerns by being unable to live up to its boasting, confirming the reasonableness of the board's basis for failing to approve the change in control.[112]

The sketchy testimony of Jordan that he regards the incumbent slate on which he serves as better qualified than the TPG slate, and that the TPG slate lacks enough experience and does not have a clear plan to replace Ward as CEO, does not approach the specific basis that the board in *Hills* identified as the basis for failing to approve a change in control.[113] Therefore, *Hills* cuts against, rather than supports, SandRidge's position.

### E. *Kallick Is Entitled To A Preliminary Injunction*

■ Kallick has shown that he is entitled to a preliminary injunction. It ap-

---

**108.** *Id.* at 91.

**109.** *E.g.*, Definitive Consent Solicitation Statement, at 12.

**110.** *See Hills*, 769 A.2d at 95–96.

**111.** *Id.* at 101.

**112.** *Id.*

**113.** Jordan Dep. 35:25–36:20 ("Q: At the December 27th meeting, what was discussed with respect to the qualifications of TPG–Axon's nominees? A: *I really don't recall*, but it's the pounding theme from day one is that

*they are not only unqualified, they are—they would totally destroy and erode all value away from the company.* Q: Did Mr. Ward express an opinion on TPG–Axon's nominees at the December 27th meeting? A: I don't recall what he said. Q: Has Mr. Ward ever expressed an opinion regarding TPG–Axon's director nominees? A: I'm sure he has, but I don't—I don't recall the exact verbiage or what he said. He knows they're not qualified. Q: Okay. Has he provided any additional color beyond his opinion that they're unqualified? A: No, he hasn't.") (emphasis added).

pears, on this record, that the SandRidge directors are violating their fiduciary duty. Thus, for the reasons I have explained, he has a strong likelihood of success on the merits. On the second prong of the test, because "it constitutes a fundamental offense to the dignity of [the] corporate office for a director to use corporate power to seek to coerce shareholders in the exercise of the vote," there is immediate, irreparable harm when the directors of a corporation leverage a Proxy Put to enhance the incumbent's board chances of procuring stockholder votes in a closely contested election, which could be decided by a few percentage points.[114] Irreparable harm also exists because damages would be difficult to calculate.[115] And, on the third prong, I find that the balance of equities favor Kallick over the incumbent board. This is particularly true because Kallick is seeking narrowly tailored relief that is proportionate to the conduct of the incumbent board. Therefore, the conditions for a preliminary injunction are satisfied.

In his complaint, Kallick moved for mandatory and declaratory relief requiring the incumbent board to approve the TPG slate and to have all consent revocations the board has received so far declared invalid.[116] In his briefing, Kallick requests a narrower form of relief, seeking (i) to enjoin the defendants from soliciting any consent revocations; (ii) to have any consent revocations obtained to date declared invalid; and (iii) to enjoin the defendants from taking any steps to hinder TPG's consent solicitation until they have com-

plied with their fiduciary duties, and have approved the TPG slate or explained in full why they will not approve it.[117] Because this is a motion for a preliminary injunction, I grant the negative injunctive relief only, and do not grant the mandatory or declaratory relief.[118] Therefore, I enjoin the incumbent board from: (i) soliciting any further consent revocations; (ii) relying upon or otherwise giving effect to any consent revocations they have received to date; and (iii) impeding TPG's consent solicitation process in any way, unless and until the board approves the TPG slate for the limited purposes of the Proxy Put. Given the cloud the incumbent board has intentionally flown over the voting decisions and the absence of any rational, good faith justification for its non-decision as to approval, I believe this limited injunctive relief is proportionate and equitable. The incumbent board is not without options. It can solicit consent revocations again if it decides to approve the TPG slate for purposes of the Proxy Put. And SandRidge stockholders, of course, remain free to revoke any consent given to TPG. SandRidge may disclose this decision publicly in an SEC filing and that will make that option clear.

## IV. Conclusion

I grant Kallick injunctive relief as set forth in this opinion. The plaintiff is to submit an implementing order, after notice as to form to the defendants, by the end of the day.

---

**114.** *Sutton Hldg. Corp. v. DeSoto, Inc.,* 1991 WL 80223, at *1 (Del.Ch. May 14, 1991).

**115.** *See Sealy Mattress Co. v. Sealy, Inc.,* 532 A.2d 1324, 1341 (Del.Ch.1987).

**116.** V. Am. Compl. 35–36.

**117.** Pl's. Op. Br. 27.

**118.** *See, e.g., Williamson v. McMonagle,* 83 A. 139, 140 (Del.Ch.1912) ("Preliminary injunctions should not generally be mandatory....").